**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Dennis LeVEQUE, Defendant– Appellant.**

**United States of America, Plaintiff–Appellee,**

**v.**

**John Kevin Moore, Defendant– Appellant.**

**Nos. 00–30385, 00–30386.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 7, 2001.

Filed March 15, 2002.

---

Gregory A. Jackson, Jackson Law Firm, Helena, MT, for defendant–appellant Dennis LeVeque.

Peter A. Leander, Bigfork, MT, for defendant–appellant John Moore.

Kris A. McLean, Assistant United States Attorney, Missoula, MT, for the plaintiff–appellee.

Before: TASHIMA, and TALLMAN, Circuit Judges, and MOLLWAY,* District Judge.

## OPINION

TALLMAN, Circuit Judge.

This case arises from a six-day outfitted archery elk hunt in Montana. Dennis LeVeque and John Moore were convicted by jury on one count of mail fraud for devising a scheme to obtain money or property, namely outfitting or guiding fees and a hunting license, under 18 U.S.C. §§ 2 & 1341. Moore was also convicted on one count of conspiracy and one count of violating the Lacey Act, under 18 U.S.C. § 371, 16 U.S.C. §§ 3372(a)(2)(A) & 3373(d)(1)(B), in connection with taking a prohibited type of elk during the hunt. On appeal, LeVeque and Moore challenge the sufficiency of the evidence and the district court's jury instructions. Moore also challenges the validity of the Superseding Indictment. We have jurisdiction under 28 U.S.C. § 1291. We reverse on all counts and remand the mail fraud count for retrial.

## I

Dennis LeVeque was licensed by the State of Montana to provide outfitting services for hunting expeditions under the name of DL Elk Outfitters, Inc. Kevin Moore was licensed by the State of Montana to provide guide services. Moore, while not a licensed outfitter, nonetheless recruited hunters, organized hunts, and collected monies for the hunts under the name "Whitetail Classics." In September 1998, in concert with LeVeque, Moore organized a six-day outfitted elk hunt in Montana for archery hunters Rex Easton, R.E. McMaster, and Kevin and James Warning. LeVeque, who had been leasing hunting rights from Montana rancher Bill Galt for almost two decades, told Galt that the archery season hunters were his clients and that they were hunting under his outfitting license. LeVeque agreed to pay Galt one-third of the total value he received from the 1998 archery season. Moore, in turn, agreed to pay LeVeque $10,000 to bring hunters onto Galt's ranch to hunt elk. Moore was to retain any sum beyond the $10,000 he paid to LeVeque.

Moore's successful solicitation of Easton, McMaster, and the Warnings did not include informing the hunters that LeVeque, not Moore, was the outfitter licensed for their hunt. One of the hunters, McMaster, while not fully aware of the relationship

* Honorable Susan Oki Mollway, United States District Judge for the District of Hawaii, sitting by designation.

between LeVeque and Moore, did learn prior to the hunt that LeVeque was providing some outfitting services.

Montana requires all non-residents who wish to take game from the State to obtain a hunting license, either by being chosen in a random lottery drawing or by hiring an outfitter. All of the hunters except McMaster obtained hunting licenses from Montana through the lottery process. When he was not randomly drawn for an out-of-state hunter's license, McMaster, on Moore's advice, obtained his hunting license through the outfitter process. LeVeque thus sponsored the non-resident license application with McMaster's knowledge. LeVeque falsely certified to Montana fish and game officials on the license application that he had received a deposit from McMaster and that he had provided McMaster with a statutorily required rate sheet and deposit refund policy. McMaster obtained an outfitter-sponsored Montana non-resident hunting license on the basis of this fraudulent application.

During the September 1998 season, Galt's ranch was designated as a "brow tine bull only" hunting area. The term "brow tine" refers to the antler configuration of a mature bull elk that has visible points of four inches or greater on the lower half of its antlers. The guides failed to inform the hunters of the "brow tine bull only" restriction. On the third day of the hunt, McMaster killed a non-brow tine bull elk. He was guided at the time by Howard Negri, who was guiding for Moore. Neither Negri nor McMaster was aware that the elk was illegal.

When the bull was brought back to the camp, several of the hunters questioned the legality of the kill. One hunter decided to check his regulation book. While the small group of hunters ultimately concluded that the bull was illegal, they kept this information to themselves. Accordingly,

no one, including Moore, informed McMaster that he had killed an illegal elk. Under Montana law, Moore was obligated to report the taking of an illegal elk to the game warden. The kill was not reported. McMaster left camp the following day with the elk. He then had the hide tanned and shipped to his home in Texas.

Following McMaster's departure, several game wardens entered the hunting camp to investigate Moore's illegal outfitting. Approximately one year later, Moore learned that the game wardens were questioning the legality of McMaster's kill. Moore then left a voice mail message for McMaster asking him what he had learned from the game wardens. Moore stated: "I don't understand what all the hassle is about. As far as I know, they don't have a clue where that elk was killed. And it happened to border two other areas that are either sex, so the brow tine rule wouldn't apply. Nevertheless, I believe this is a legal bull and will stand by it."

LeVeque and Moore were subsequently indicted on one count of mail fraud. A Superseding Indictment, on which defendants stood trial, did not allege as the basis for fraud that Moore was outfitting without a license. The Superseding Indictment instead charged LeVeque and Moore with devising "a scheme ... to obtain ... money or property, namely outfitting or guiding fees *and* a State of Montana Outfitter sponsored nonresident big game combination hunting license, by means of false or fraudulent pretenses, representations, or promises...." (Emphasis added.) The Superseding Indictment further charged that the predicate mailing was the transmittal of McMaster's fraudulent application to the State for the outfitter-sponsored hunting license.

Moore was also indicted on one count of conspiracy to violate the Lacey Act, aiding

**1102**

and abetting a violation of the Lacey Act when McMaster took the elk for taxidermy and later shipment to Texas in violation of fish and game regulations, and another count of violating the Lacey Act when McMaster took the illegal elk across state lines to Texas.

At the close of trial, the district court instructed the jury that a "central issue" in this case was whether Moore was outfitting without a license. The court also instructed the jury that "an outfitter need not personally perform all outfitting duties. However, an outfitter may not delegate away to an unlicensed person those functions which only a licensed outfitter may perform." Both LeVeque and Moore objected to these instructions.

The jury convicted both defendants of mail fraud, and it convicted Moore of conspiracy, and violation of the Lacey Act predicated on the illegal transportation violation. Moore was acquitted of the Lacey Act count predicated on the alleged fish and game regulation violation. On December 8, 2000, LeVeque was sentenced to a two-year term of probation. On the same date, Moore was sentenced to six months in custody, three years' supervised release, plus monetary penalties. LeVeque and Moore timely appeal.

**II**

■ We review de novo claims of insufficient evidence. *See United States v. Antonakeas,* 255 F.3d 714, 723 (9th Cir. 2001). The evidence is sufficient to support a conviction if, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**A.**

LeVeque and Moore challenge the sufficiency of the evidence to sustain the mail fraud convictions, contending that the Government based its fraud theory on the false statements contained in McMaster's application for an outfitter-sponsored hunting license, and that, under *Cleveland v. United States,* 531 U.S. 12, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000), a government-issued license is not "property" for the purposes of the mail fraud statute, 18 U.S.C. § 1341. We agree, in part.

■ Section 1341 prohibits the use of the mails to further "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *Cleveland* holds that a government-issued license does not constitute property for purposes of § 1341. *See Cleveland,* 531 U.S. at 26–27, 121 S.Ct. 365 (holding that § 1341 did not cover a scheme in which the defendants misrepresented the ownership of a partnership in order to obtain a state gambling license because the license was not property under § 1341). *See also United States v. Kato,* 878 F.2d 267 (9th Cir.1989) (holding that § 1341 did not cover a flight training school owner's scheme to defraud the FAA into issuing pilot licenses to unqualified candidates because the licenses were not property); *United States v. Lew,* 875 F.2d 219 (9th Cir.1989) (holding that § 1341 did not cover an attorney's misrepresentations in applications for alien employment certifications because the certifications were not property and the Government offered no evidence that the clients of the attorney, the aliens, were defrauded in any way).

Thus, to the extent that the Government's theory of mail fraud was based upon a government-issued license it is invalid. Unfortunately, we are unable to

determine whether the jury relied on this invalid theory in reaching its verdict.

■ As set forth above, LeVeque and Moore were charged in Count I of the Superseding Indictment with "a scheme ... to obtain ... money or property, namely outfitting or guiding fees and a State of Montana Outfitter sponsored nonresident big game combination hunting license." The use of the conjunctive "and" between the Count's reference to money or property and its reference to the license might have required the jury to find that the State-issued hunting license was a necessary object of the alleged fraudulent scheme. In the alternative, the jury may have read the clause following "money or property" to provide examples of "money or property." Under the former construction, LeVeque and Moore's convictions are not sustainable. Under the latter construction, however, they might be.[1]

■ Because it is questionable which construction was relied on, and the trial court did not clearly instruct the jury that it could only convict defendants based on the obtaining of money (and not the hunt-

ing license), it remains unclear whether the jury convicted Moore and LeVeque on Count I based on the obtaining of the hunting license from the government, the obtaining of money from McMaster, or both.[2] Having decided that the Government's mail fraud theory is only partially valid, and being unable to determine whether the jury considered the invalid theory in reaching its verdict, we must consider defendants' claim that there was insufficient evidence to sustain a conviction on this Count.

### B.

LeVeque and Moore challenge the sufficiency of the evidence to sustain the mail fraud convictions on the grounds that their misrepresentations were immaterial and that they did not act with the intent to defraud McMaster. We disagree.

■ ■ First, there is sufficient evidence to support a finding of material misrepresentation. A false promise, statement or representation is material if "it is made to induce action or reliance by anoth-

---

**1.** In *United States v. Bettencourt,* 614 F.2d 214, 219 (9th Cir.1980), we held that a jury may convict a defendant by finding any of the elements of a disjunctively defined offense, despite the use of conjunctive language in the indictment. Pursuant to this precedent, the Government might secure a conviction under § 1341 by proving the object of the fraudulent scheme was money, not property. *See United States v. Fulbright,* 105 F.3d 443, 449 (9th Cir.1997) ("Where a statute enumerates several means of committing an offense, an indictment may contain several allegations in the conjunctive.") (citing *United States v. Miller,* 471 U.S. 130, 136, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985)); *United States v. Abascal,* 564 F.2d 821, 832 (9th Cir.1977) ("The government may charge in the conjunctive form that which the statutes denounce disjunctively, and evidence supporting any one of the charges will support a guilty verdict."). Here, the conjunctive language appears in what might be considered a descriptive

clause. Such language may be considered surplusage in this context. *See Ford v. United States,* 273 U.S. 593, 602, 47 S.Ct. 531, 71 L.Ed. 793 (1927) (holding the portion of the indictment charging the defendants with violating a treaty that created no offense against the laws of the United States was mere surplusage that could be ignored); *United States v. Jenkins,* 785 F.2d 1387, 1392 (9th Cir.1986) ("Insofar as the language of an indictment goes beyond alleging elements of the crime, it is mere surplusage that need not be proved.").

**2.** The jury instructions stated that the element of money or property was satisfied if the jury concluded "that the defendant made up a scheme or plan for obtaining money or property by making false promises or statements, with all of you agreeing on at least one particular false promise or statement." Transcript at 864–65. The jury verdict form asked the jury to decide only whether Moore and/or LeVeque were guilty.

# 1104

er" or has "a natural tendency to influence or is ... capable of influencing another's decisions[.]" *United States v. Halbert*, 712 F.2d 388, 390 (9th Cir.1983). Here, McMaster reasonably relied on LeVeque and Moore's misrepresentation that they could lawfully sponsor a valid non-resident hunter application and thereby obtain for him his hunting license as the outfitter's client. This misrepresentation was material because McMaster agreed to purchase defendants' services believing that they had the capacity legally to sponsor his application.[3] McMaster therefore was tricked into obtaining his non-resident hunting license through the outfitter process, participating in the hunt, and taking an elk, all in reliance upon defendants' false representations that he had paid for a legal outfitter who, in full compliance with Montana law, could sponsor the proper submission of his out-of-state license application. The jury could find that this misrepresentation was material as no reasonable hunter would engage an outfitter who was not qualified to sponsor his non-resident hunting license.

The facts of this case are therefore distinguishable from *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970), upon which defendants rely. In *Regent Office Supply*, the Government was unable to sustain a mail fraud conviction where the company selling office supplies required its salespersons to falsely state to prospective customers, *inter alia*, that they had been referred by the customers' friends, or that stationery of friends of the salesperson was available because of someone's death, in order to gain access to make their sales pitch. The Second Cir-

cuit reasoned that such statements were not material misrepresentations in furtherance of a scheme to defraud because the statements did not misrepresent the price or quality of the product being sold. Moreover, there was no misrepresentation made by the salespersons regarding the advantages of buying the goods being offered for sale.

Here, defendants materially misrepresented the advantages of their offer. McMaster wanted a licensed outfitter to sponsor his hunt because he needed outfitter sponsorship in order to obtain a non-resident license. Inherent in McMaster's decision to pay for a licensed outfitter to sponsor his hunting license was the assumption that the outfitter was qualified to sponsor such an application and thus could validate an out-of-state application submitted on his behalf. Defendants' misrepresentation to the contrary was therefore material because, given that Moore had retained all of the fees paid by the hunters above the $10,000 that he paid to LeVeque, it was not possible for LeVeque, as McMaster's sponsor, accurately to certify to the State that he had received a deposit from McMaster and had provided him with the statutorily required rate sheet and deposit refund policy. As stated above, after McMaster failed to win a license in the lottery, outfitter sponsorship was the only way he could obtain one. Because the financial arrangement between Moore and LeVeque precluded LeVeque from submitting an application on McMaster's behalf that complied with Montana law, the misrepresentations to the contrary were mate-

---

**3.** Having failed to obtain by lot an out-of-state hunting license, McMaster's only alternative was to obtain one through the sponsorship of an outfitter. Neither Moore nor LeVeque, however, was in a position, given the undisclosed financial arrangement between them, to sponsor a license application on McMas-

ter's behalf. Their undisclosed financial arrangement violated Montana law which required the outfitter to provide the hunter with information regarding a deposit refund and rates. Since this information had not been disclosed, it was false to certify to the State that the outfitter had done so.

rial, as they undermined the very basis of the bargain with McMaster.

■ Similarly, we find sufficient evidence in the record to support a finding of intent to defraud. *See United States v. Utz*, 886 F.2d 1148, 1150–51 (9th Cir.1989) (actual fraud is not required for a conviction; the critical element is whether there was fraudulent intent). The jury could find that LeVeque and Moore knew that they could not submit a valid license application on McMaster's behalf. The jury could also find that they nevertheless worked together for their own financial gain. *See United States v. Cloud*, 872 F.2d 846, 852 n. 6 (9th Cir.1989) ("intent to defraud" means "to act willfully, and with the specific intent to deceive or cheat for the purpose of either causing some financial loss to another, or bringing about some financial gain to oneself"). In so doing, the jury could find that defendants intended to mislead McMaster into paying for outfitting or guiding fees based upon the representation that Moore and LeVeque were able legally to sponsor him when he applied for and obtained his non-resident hunting license, when in fact they could not do so.

Given the evidence that defendants intentionally provided a false reason for being able to offer the non-resident hunt to McMaster, we hold there is sufficient evidence from which a jury could find that defendants acted with intent to defraud. The fact that defendants' misrepresentations were capable of affecting McMaster's understanding of the bargain, and of influencing his decision to part with his money, supports a finding of intent to defraud. *See Regent Office Supply*, 421 F.2d at 1182.

There was sufficient evidence to support a properly instructed jury verdict that Moore and LeVeque devised a scheme for obtaining outfitting and guiding fees by misrepresenting to McMaster, among others, that he was paying for and receiving legal sponsorship of his non-resident hunting license application and a qualified Montana outfitter to guide him on the hunt. There is evidence that the fraudulent misrepresentations caused McMaster's secretary to deposit a State-required certification in the mail for the purpose of obtaining the non-resident outfitter-sponsored license in furtherance of defendants' scheme to defraud McMaster, and that McMaster paid defendants for their guide services in furtherance of the scheme.

■ We therefore reverse the convictions on Count I of the Superseding Indictment and remand that count for retrial.[4] *See United States v. Sheeran*, 699 F.2d 112, 115 (3rd Cir.1983). To avoid the *Cleveland* dilemma, discussed in Section II.A. of this opinion, the district court should instruct the jury on remand that it must unanimously determine that the *object* of their scheme or artifice to defraud was to obtain *money*, not the non-resident hunting license.[5]

### III

Moore contends that there was insufficient evidence to prove that he violated the Lacey Act (Count IV). The Lacey Act provides: "It is unlawful for any person . . . to . . . transport, [or] sell . . . in interstate . . . commerce any . . . wildlife taken . . . in violation of any law or regulation of any State . . . ." 16 U.S.C. § 3372(a)(2)(A). Providing outfitting or guiding services for

---

**4.** In light of this holding we need not reach appellants' remaining challenges to Count I.

**5.** This does not mean, of course, that evidence of how the non-resident license was obtained

is irrelevant. The Government may still offer proof that defendants caused the submission of a fraudulent application for the non-resident hunting license as a means of carrying out the overall scheme to defraud.

a fee is deemed to be a "sale" for purposes of the Lacey Act. *See id.* § 3372(c)(1)(A).[6]

■ Moore asserts that the Government failed to prove that he possessed the necessary mens rea to commit a Lacey Act violation because he did not know that the Galt Ranch had been designated a brow tine bull only area for 1998. To satisfy the mens rea requirement of the Lacey Act, the Government need not show that the defendant knew the particular law that was violated, but must at least prove that the defendant knew that the wildlife was taken or possessed in violation of state law. *See* 16 U.S.C. § 3373(d)(1)(B); *United States v. Santillan,* 243 F.3d 1125, 1129 (9th Cir.), *cert. denied,* —— U.S.——, 122 S.Ct. 321, 151 L.Ed.2d 240 (2001). Moore was convicted under § 3373(d)(1)(B), the felony provision, which requires actual knowledge that the game was taken in violation of state law. This subsection stands in contrast to § 3373(d)(2), the misdemeanor provision, in which the Government need only show that the defendant "in the exercise of due care should know" that the game was taken in violation of state law. *See also United States v. Thomas,* 887 F.2d 1341, 1346 (9th Cir.1989) (describing the difference between subsections (d)(1)(B) and (d)(2)).

Moore, as a licensed guide with a legal duty to know the regulations, should have known that the Galt Ranch was a brow tine bull only hunting area. Because Moore was not charged under subsection (d)(2), however, the Government had to prove his actual knowledge. The Government's only evidence from which the jury could infer that Moore knew that McMaster's elk was illegal was the voice mail message Moore left for McMaster. This message was left long after the hunt and, thus, long after the "sale" (providing the

outfitting services) had occurred. This evidence is therefore not probative of Moore's state of mind at the time of the violation.

There was no evidence at trial that anyone besides a few hunters in camp suspected the kill was illegal. Those witnesses testified that they did not discuss their suspicions with Moore. Moore did not testify at trial. Because the Lacey Act violation as charged in this case, by its plain terms, requires that the defendant actually know that the taking was illegal, and there was no such evidence, we reverse Moore's conviction for violation of the Lacey Act predicated on the State law violation for insufficiency of the evidence.

## IV

■ Moore also contends that there was insufficient evidence to support a conviction for conspiracy under the Lacey Act 4322 because there was no evidence of an agreement among himself, McMaster, and Howard Negri, the guide who accompanied McMaster when he downed the elk. Moore is correct. To prove the existence of a conspiracy, the Government must establish that there was an agreement among two or more persons to accomplish an unlawful objective, and that the defendant committed an overt act in furtherance of the conspiracy. *See* 18 U.S.C. § 371; *United States v. Krasovich,* 819 F.2d 253, 255 (9th Cir.1987).

The Government offered no evidence at trial of an express agreement among Moore, McMaster, and Negri. In fact, the Government concedes that Moore never told McMaster that he could only kill a brow tine bull elk before the hunt. Negri testified further that he never discussed

---

**6.** Congress added this section to the Lacey Act in 1988 to overturn our holding in *United States v. Stenberg,* 803 F.2d 422 (9th Cir. 1986), that the sale of guiding or outfitting services could not form the basis for a substantive Lacey Act violation.

this restriction with McMaster or Moore prior to the hunt. McMaster corroborated Negri's testimony. An agreement may be inferred from the evidence, *id.*, but the Government must offer some evidence from which an agreement among the alleged co-conspirators can be inferred. On this record there was none. We therefore reverse Moore's conspiracy conviction (Count II) for insufficiency of the evidence because the Government failed to demonstrate the existence of an agreement among Moore, McMaster, and Negri to violate the Lacey Act.

### V

LeVeque and Moore's convictions and sentences on the mail fraud count (Count I) are reversed and remanded for retrial; Moore's convictions and sentences on the conspiracy and Lacey Act violations (Counts II & IV) are reversed. The case is remanded to the district court for further proceedings as to Count I with instructions to dismiss Counts II & IV of the Superseding Indictment. The district court shall vacate the judgment of convictions as to those two counts and shall refund any monetary assessments imposed under them.

**REVERSED and REMANDED, in part for a new trial.**