John **FOUNTAIN**, also known as Chick, Petitioner–Appellant,

v.

**UNITED STATES** of America, Respondent–Appellee.

Docket No. 03–2188.

United States Court of Appeals, Second Circuit.

Argued: Nov. 4, 2003.

Decided: Jan. 26, 2004.

---

Bruce R. Bryan, Syracuse, NY, for Petitioner–Appellant John Fountain.

Elizabeth S. Riker, Assistant United States Attorney, for Glenn T. Suddaby, United States Attorney for the Northern District of New York, for Respondent–Appellee the United States of America.

Before: McLAUGHLIN and KATZMANN, Circuit Judges SCHEINDLIN, District Judge

KATZMANN, Circuit Judge.

In the context of a petition for habeas corpus, this case considers whether, after the Supreme Court's decision in *Cleveland v. United States,* 531 U.S. 12, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000), taxes owed to a government can constitute "property" in its hands within the meaning of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343. It also evaluates the continued validity of our decision in *United States v. Trapilo,* 130 F.3d 547 (2d Cir. 1997), that the common law revenue rule does not bar criminal prosecutions under the mail and wire fraud statutes in light of our more recent decision in *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.,* 268 F.3d 103 (2d Cir.2001).

Petitioner appeals from a decision and order of the United States District Court for the Northern District of New York (Thomas J. McAvoy, *District Judge*) denying his motion for habeas corpus under 28 U.S.C. § 2255 but granting a certificate of appealability on two issues. We hold that taxes owed to a government can constitute

property in its hands within the meaning of the federal mail and wire fraud statutes, and that *Trapilo* remains good law in this Court.

## I. BACKGROUND

After retiring from twenty-one years of service to the New York State Police, Petitioner John Fountain entered the currency exchange business in Hogansburg, New York, adjacent to the St. Regis Mohawk Reservation. Using cashier's checks and wire transfers, he began exchanging Canadian for U.S. currency in conjunction with a scheme to transport cigarettes from Canada into the St. Regis Mohawk Reservation then back to Canada to be sold on the black market. The enterprise was designed to circumvent the high Canadian taxes on tobacco products.

As a result of these currency exchange activities, Fountain was indicted, along with others, in July, 1997 (the "Miller Indictment"), on the charge of conspiracy to launder the proceeds of a wire fraud scheme in violation of the money laundering statute, 18 U.S.C. § 1956(a)(1)(A)(I), 1956(h). The illegality of the underlying conduct derived from the wire fraud statute, which provides that:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire ... in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343. The government claimed that the conspiracy was intended to defraud both the United States and Canada, asserting that both countries were deprived of tax revenues.

Other individuals involved in the scheme had already been indicted in 1996 (the "Trapilo/Pierce Indictment"), and litigation had progressed in their case. These defendants had successfully moved, in the district court, to dismiss the indictment based upon the First Circuit's application of the common law revenue rule to bar a similar prosecution in *United States v. Boots,* 80 F.3d 580 (1st Cir.1996). *See United States v. Trapilo,* No. 96 Cr. 54, 1996 WL 743837, 1996 U.S. Dist. LEXIS 19237 (N.D.N.Y. Dec. 20, 1996). As the court in *Boots* explained the revenue rule, this "firmly embedded principle of common law ... holds that courts generally will not enforce foreign tax judgments, just as they will not enforce foreign criminal judgments, although they will enforce foreign non-tax civil judgments unless due process, jurisdictional, or fundamental public policy considerations interfere." *Boots,* 80 F.3d at 587. Although the criminal prosecution involved in *Boots* did not directly involve enforcement of a foreign tax judgment, the court determined that the revenue rule still operated to nullify the defendants' convictions because "[w]here a domestic court is effectively passing on the validity and operation of the revenue laws of a foreign country, the important concerns underlying the revenue rule are implicated." *Id.* at 587. When the government appealed the district court's decision in *Trapilo,* however, we reversed, holding that "[t]he [wire fraud] statute neither expressly, nor impliedly, precludes the prosecution of a scheme to defraud a foreign government of tax revenue, and the common law revenue rule, inapplicable to the instant case, provides no justification for departing from the plain meaning of the statute." *United States v. Trapilo,* 130 F.3d 547, 551 (2d Cir.1997). Based on the outcome of *Trapilo,* the district court rejected the Miller defendants' similar attempt to dismiss the indictment against

them. *See United States v. Miller,* 26 F.Supp.2d 415, 430 (N.D.N.Y.1998). Because the *Trapilo* decision was directly adverse to his position, Fountain opted not to appeal the district court's determination and instead entered a plea of guilty in the hopes of receiving a lesser sentence.

Although Fountain had been charged with the intent to defraud both the United States and Canada, he admitted only to a scheme to deprive the Canadian government of revenue at his plea allocution. As Petitioner stated, "I didn't defraud the U.S. government." Nor did the prosecutor attempt to force Fountain to acknowledge that he was guilty of doing so. As the government responded, "Mr. Fountain doesn't have to enter his plea on the basis of his participation in a conspiracy to defraud the United States of any tax revenue." The court added, "Yes, as I understand it, there is no technical requirement to fulfill the elements ... that comprise the crime that you're pleading to that there be any defrauding of the United States Government of dollars. The Court accepts that." As a result of his plea, Fountain was sentenced to 84 months' imprisonment by a judgment of conviction entered in October, 1999. This term was subsequently reduced to 60 months.

Following Petitioner's conviction, two legal developments occurred. First, the Supreme Court held, in *Cleveland v. United States,* 531 U.S. 12, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000), that unissued state video poker licenses did not qualify as "property" within the compass of the mail fraud statute—identical in all relevant respects to the wire fraud statute. *See Carpenter v. United States,* 484 U.S. 19, 25 n.6, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) ("The mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis to both sets of offenses here."). As Justice Ginsburg stated, writing for a unanimous

Court, "It does not suffice ... that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim." *Cleveland,* 531 U.S. at 15, 121 S.Ct. 365. Second, we determined, in *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.,* 268 F.3d 103 (2d Cir.2001), that the revenue rule still applies to bar civil suits aimed at enforcing foreign tax laws.

As a result of these decisions, Fountain brought a habeas petition under 28 U.S.C. § 2255, alleging that he had not violated the wire fraud statute because:

(i) the Canadian Government did not possess "property" in its hands at the time of the alleged fraud;

(ii) the wire fraud statute was not intended to protect a foreign government's rights against a scheme to defraud; and

(iii) the alleged act of fraud occurred beyond the territorial jurisdiction of the United States, and therefore failed to meet the "essential conduct element" giving jurisdiction of a United States court over the crime alleged ....

In the alternative, Petitioner claimed that his counsel had been ineffective in failing to raise these issues.

The district court ruled against Fountain, determining that he had procedurally defaulted, and that he could not surmount the default by showing either cause and prejudice or actual innocence. Furthermore, the court held that Petitioner's counsel had not been ineffective for failing to raise a revenue rule defense. However, the court did certify two issues for review by this court:

(1) whether counsel was constitutionally ineffective for failing to pursue the Revenue Rule defense in light of Pe-

titioner's assertion that he did not defraud the United States; and

(2) whether the conviction was obtained without proof beyond a reasonable doubt of each element of the crime and therefore whether Petitioner is being unconstitutionally held.

These are the questions that we consider below.

## II. ANALYSIS

▮ A court of appeals reviews a district court's denial of a 28 U.S.C. § 2255 petition *de novo*. *Coleman v. United States*, 329 F.3d 77, 81 (2d Cir.2003). The contours of Fountain's case are largely delineated by the Supreme Court's decisions in *Bousley v. United States*, 523 U.S. 614, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998), and *Massaro v. United States*, 538 U.S. 500, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003). *Bousley* held that an individual who pled guilty to "using" a firearm under 18 U.S.C. § 924(c)(1) would not be procedurally barred from bringing a habeas petition if he could demonstrate actual innocence based upon a subsequent Supreme Court case that restricted the scope of the meaning of "use" within the terms of the statute. A habeas action is not intended to substitute for a direct appeal. Any Petitioner who fails—as Bousley and Fountain did—to pursue such an appeal would ordinarily be procedurally barred from challenging his conviction. *United States v. Frady*, 456 U.S. 152, 165, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) ("[W]e have long and consistently affirmed that a collateral challenge may not do service for an appeal."). As Chief Justice Rehnquist, writing for the majority in *Bousley*, reaffirmed, however, a petitioner may overcome this procedural bar if he can demonstrate "cause" and "prejudice" or that he is "actually innocent." *See Bousley*, 523 U.S. at 622, 118 S.Ct. 1604; *Murray v. Carrier*, 477 U.S. 478, 495–96, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). In *Massaro*, the

Court added that the procedural default rule delineated by *Bousley* does not apply to claims of ineffective assistance of counsel. *See Massaro*, 123 S.Ct. at 1696. We construe the two issues that the district court certified for appeal as asking whether Fountain's counsel was constitutionally ineffective and whether Fountain can overcome the procedural bar applicable to his other claim by demonstrating actual innocence. We conclude that Petitioner cannot succeed on either basis.

## A. Ineffective Assistance of Counsel

In order to demonstrate that he suffered from ineffective assistance of counsel, a petitioner "must show that the attorney's performance fell below an objective standard of reasonableness and that the outcome of his case would have been different had the attorney performed adequately." *United States v. Perez*, 129 F.3d 255, 261 (1997); *see also Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (requiring a demonstration that (1) "counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense").

▮ Fountain argues that his trial lawyer should have pursued an appeal on the grounds that the common law revenue rule barred his conviction, and that, had such an appeal occurred, the outcome of his trial would have differed. We need not consider whether Petitioner can fulfill the first prong of demonstrating that his "attorney's performance fell below an objective standard of reasonableness," because it is clear from our precedents that, even if it did, Fountain was not prejudiced. In *R.J. Reynolds*, we distinguished between "civil suit[s] brought by a foreign sovereign" and criminal "actions prosecuted by the United States," determining that the revenue rule applied in the former but not in the latter context. *R.J. Reynolds*, 268

F.3d at 123 and n. 24. In so doing, we did not challenge the validity of our prior decision in *Trapilo,* which held that the revenue rule permitted prosecution under the wire fraud statute for tax fraud against foreign governments.[1] Because Fountain would not be able, under *Trapilo,* to invoke the revenue rule to invalidate his criminal conviction, he was not prejudiced by his attorney's failure to raise this defense on appeal.

## B. Actual Innocence

■ We read the second issue that the district court certified—"whether the conviction was obtained without proof beyond a reasonable doubt of each element of the crime and therefore whether Petitioner is being unconstitutionally held"—as asking whether Fountain is actually innocent of money laundering because taxes, the object of his scheme to defraud, do not constitute property under the wire fraud statute after the Supreme Court's decision in *Cleveland v. United States,* 531 U.S. 12, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000). In order to establish actual innocence, "petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley,* 523 U.S. at 623, 118 S.Ct. 1604 (internal citations and quotation marks omitted). Furthermore, in the context of a habeas petition following a guilty plea, because " 'actual innocence' means factual innocence, not mere legal insufficiency," *Bousley,* 523 U.S. at 623, 118 S.Ct. 1604, "the Government is not limited to the existing record to rebut any showing that petitioner might make. Rather ... the Government should be permitted to present any admissible evidence of petitioner's guilt even if that evidence was not present-

ed during petitioner's plea colloquy...." *Id.* at 623–24., 118 S.Ct. 1604 Because we hold that, under *Cleveland,* taxes remain property within the purview of the mail and wire fraud statutes, we need not reach the further question of whether the government can adduce additional evidence to demonstrate Fountain's factual guilt.

■ As we have previously summarized, "[t]he essential elements of a mail [or wire] fraud violation are (1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the mails [or wires] to further the scheme." *United States v. Dinome,* 86 F.3d 277, 283 (2d Cir.1996) (internal citation and quotation marks omitted). The mail and wire fraud statutes prohibit the use of both means of transmission in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *See* 18 U.S.C. §§ 1341, 1343. Until 1987, many circuit courts interpreted "scheme or artifice to defraud" and "obtaining money or property" disjunctively, refusing to construe the "money or property" requirement as a limitation on the kinds of schemes to defraud covered by the statute. In *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), however, the Court determined that the mail fraud statute's "sparse legislative history ... indicates that the original impetus behind the mail fraud statute was to protect the people from schemes to deprive them of their money or property." *Id.* at 356, 107 S.Ct. 2875. As a result, the Court read the statute as "limited in scope to the protection of property rights," *id.* at 360, 107 S.Ct. 2875, and held that it did not protect

---

1. Petitioner would have us, a three-judge panel, overrule the law of the Circuit as expressed in *Trapilo.* We were not free to do so in *R.J. Reynolds,* and we are not free to do so now.

*See Monsanto v. United States,* 348 F.3d 345, 351 (2d Cir.2003) (explaining that we are bound by prior precedent of this Court unless it is overturned *in banc*).

the "intangible right of the citizenry to good government," *id.* at 356, 107 S.Ct. 2875, stating that, "[i]f Congress desires to go further, it must speak more clearly than it has," *id.* at 360, 107 S.Ct. 2875. Taking up the Court's invitation to action, Congress then expanded the law's reach to permit prosecutions for any scheme to defraud aimed at "the intangible right of honest services." Anti–Drug Abuse Act of 1988, § 7603(a), 18 U.S.C. § 1346; *but see Cleveland,* 531 U.S. at 20, 121 S.Ct. 365 (observing that, "[s]ignificantly, Congress covered only the intangible right of honest services even though federal courts, relying on *McNally,* had dismissed, for want of monetary loss to any victim, prosecutions under § 1341 for diverse forms of public corruption, including licensing fraud").

Under this new statutory language, courts construed the "property" requirement liberally. In particular, the Second Circuit, following a number of other courts, permitted prosecutions for tax fraud to proceed under the mail and wire fraud statutes. *See United States v. Helmsley,* 941 F.2d 71, 94 (2d Cir.1991) (upholding a mail fraud conviction for tax fraud and determining that "[t]he absence of proof of taxes actually due to New York State is immaterial because success of a scheme to defraud is not required"); *United ed States v. Porcelli,* 865 F.2d 1352, 1360 (2d Cir.1989) (stating that, under *McNally* and *Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), "the fact that New York's interest in unpaid sales taxes is intangible is no obstacle to a mail fraud prosecution"); *United States v. DeFiore,* 720 F.2d 757, 761 (2d Cir.1983) (explaining that "four circuits before us have squarely applied the federal fraud statutes to state tax law violations").

■ In deciding *Cleveland,* the Supreme Court reaffirmed that the scope of the mail and wire fraud statutes is not unbounded. The modest extent to which we understand the *Cleveland* decision to have reconfigured the existing landscape dictates our resolution of Petitioner's claim that, after *Cleveland,* taxes can no longer be considered property under the mail and wire fraud statutes. In *Cleveland,* Justice Ginsburg, writing for a unanimous Court, held that "[s]tate and municipal licenses in general ... do not rank as 'property,' for purposes of [the mail fraud statute], in the hands of the official licensor," and that "[i]t does not suffice ... that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim." *Cleveland,* 531 U.S. at 15, 121 S.Ct. 365. In arriving at the conclusion that licenses are not property in the hands of the state, the Court examined a number of factors conducing to a determination of what should be categorized as property. The *Cleveland* Court emphasized the regulatory as opposed to revenue-collecting nature of Louisiana's video poker licenses and the fact that the State could not alienate its licensing authority, *id.* at 20–23, 121 S.Ct. 365, while downplaying the significance of the right to exclude, *id.* at 24, 121 S.Ct. 365, a right that other cases deemed crucial in defining property. *See, e.g., Carpenter,* 484 U.S. at 26–27, 108 S.Ct. 316 (1987) (claiming that "exclusivity is an important aspect of confidential business information and most private property for that matter"). We do not read the Court's particular selection of factors as establishing rigid criteria for defining property but instead as providing permissible considerations.

The factor upon which the Court appears to have placed most weight is whether the government's right is regulatory or revenue-enhancing. Some of the language in *Cleveland* suggests that the Court balanced the regulatory against the revenue-collecting aspects of the video poker licens-

ing scheme. *See Cleveland,* 531 U.S. at 20–22, 121 S.Ct. 365 (describing the State's "core concern" as "regulatory" despite the fact that the State argued that it "receives a substantial sum of money in exchange for each license and continues to receive payments from the licensee as long as the license remains in effect"). In the tax context, however, the attempt to discern whether particular laws are aimed more at generating revenue or at regulating may not be easily accomplished. Taxes, as products of the legislative stew, may have a variety of ingredients and purposes, and the primacy of one or another may not be readily distilled from the congressional cauldron. Indeed, every legislative choice to tax involves policy judgments as well as the decision to add to the government's financial resources. The imbrication of the regulatory with the revenue-collecting is particularly apparent in the context of taxes like those at issue in this case—taxes upon cigarettes, alcohol, or other items of which the state wishes to regulate the consumption but from which it also raises revenue. We therefore place weight upon the Court's observation that monetary loss was not involved at all in the offense underlying the conviction in *Cleveland:*

> Tellingly, as to the character of Louisiana's stake in its video poker licenses, the Government nowhere alleges that Cleveland defrauded the State of any money to which the State was entitled by law. Indeed, there is no dispute that TSG paid the State of Louisiana its proper share of revenue, which totaled more than $1.2 million, between 1993 and 1995. If Cleveland defrauded the State of "property," the nature of that property cannot be economic.

*Cleveland,* 531 U.S. at 22, 121 S.Ct. 365. This formulation indicates that, in the context of government regulation, monetary loss presents a critical, perhaps threshold consideration. The mere fact that the government is authorized to collect revenue under the provisions of a licensing law is not determinative; the relevant inquiry is, rather, whether the scheme prosecuted under the mail or wire fraud statute is designed to defraud the government of its revenues or of its licenses. It is in this light that the Court's statement upon which Petitioner relies—that, "[e]ven when tied to an expected stream of revenue, the State's right of control does not create a property interest any more than a law licensing liquor sales in a State that levies a sales tax on liquor," *id.* at 23, 121 S.Ct. 365—must be interpreted. While a liquor license might not constitute property in the hands of the state, the sales taxes that the government can anticipate collecting from transactions in alcohol are property under the mail and wire fraud statutes.

This result accords with the manner in which the government's right to collect taxes has historically been treated even outside the context of the mail and wire fraud statutes. In *Manning v. Seeley Tube & Box Co. of New Jersey,* 338 U.S. 561, 70 S.Ct. 386, 94 L.Ed. 346 (1950), the Supreme Court, considering the extent to which a taxpayer was obliged to pay interest on an assessed tax deficiency, determined that, "[f]rom the date the original return was to be filed until the date the deficiency was actually assessed, the taxpayer had a positive obligation to the United States: a duty to pay its tax," and that, "[i]n the absence of a clear legislative expression to the contrary, the question of who properly should possess the right of use of the money owed the Government for the period it is owed must be answered in favor of the Government." *Id.* at 565–66, 70 S.Ct. 386. In general then, taxes owed to the government—even if not yet collected—are property in the hands of the government.

Likewise, before *Cleveland,* none of the circuits considering the question whether

taxes are property in the hands of the government determined that they are not. *See, e.g., United States v. Dale,* 991 F.2d 819, 849 (D.C.Cir.1993) (per curiam) ("adopt[ing] the position and reasoning of all other courts that have published decisions squarely on point" and upholding wire fraud convictions because "the tax code is not the exclusive regime under which tax fraud schemes may be prosecuted"); *United States v. Helmsley,* 941 F.2d 71, 94–95 (2d Cir.1991) (upholding a mail fraud conviction based upon state tax fraud); *United States v. Bucey,* 876 F.2d 1297, 1310 (7th Cir.1989) (holding, based on "the general principle that the government has a property right in tax revenues on the date that they accrue," that "a scheme to defraud the United States of money and property, that is, income taxes satisfies the *McNally* money or property requirement" (internal quotation marks omitted)); *United States v. Miller,* 545 F.2d 1204, 1216 n. 17 (9th Cir.1976) (upholding a mail fraud conviction based upon the filing of false tax returns). The only related case to hold otherwise is *United States v. Henderson,* 386 F.Supp. 1048 (S.D.N.Y.1974), a district court case dismissing mail fraud counts against a defendant on the ground that Congress did not intend for schemes to defraud the federal government of tax revenue to be prosecuted under the mail fraud statute. Although this Circuit has not explicitly disapproved of the decision in *Henderson,* other district courts in this Circuit have reaffirmed the general principle that taxes can be the object of conduct criminalized by the mail and wire fraud statutes. *See, e.g., United States v. Regan,* 713 F.Supp. 629, 634 (S.D.N.Y.1989) (noting that "[e]fforts to rely on [the *Henderson* court's] broad claim that the mail fraud statute was not intended to reach the crime of tax evasion have been decisively rejected by the Second Circuit in cases involving distinguishable fact patterns"). *Henderson*—which

other circuits have rejected, *see, e.g., Miller,* 545 F.2d at 1216 n. 17—thus provides weak authority for the proposition that schemes aimed at defrauding the government of taxes do not fall within the scope of the mail and wire fraud statutes.

The contrast between this relatively clear picture and the turmoil within federal courts over the question of whether licenses constituted property under the mail and wire fraud statutes before *Cleveland* is additionally instructive. By the time that the Supreme Court intervened to resolve the debate, a majority of the circuits had already determined that "the government does not relinquish 'property' for purposes of [the mail fraud statute] when it issues a permit or license." *Cleveland,* 531 U.S. at 17, 121 S.Ct. 365; *see id.* at 17–18, 121 S.Ct. 365 (citing decisions by the Second, Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits). Several of these circuits, including the Seventh, had held that income taxes were property with respect to the mail and wire fraud statutes. *See United States v. Goulding,* 26 F.3d 656, 663 (7th Cir.1994) (stating that a count in the indictment "charged a scheme to obtain money and property, namely income taxes"). Taxes were thus much more firmly identified as property pre-*Cleveland* than permits and licenses; were *Cleveland* meant to foreshadow the shattering of that consensus, the Supreme Court might reasonably have been expected to signal that there was at least a question as to whether taxes might be excluded from the definition of property under the mail fraud statute. This the Court did not do.

Other courts' interpretations of *Cleveland* have likewise confirmed the conceptual difference between treating taxes and considering licenses as property. Most applications of *Cleveland* have occurred in the licensing context. *See, e.g., United States v. LeVeque,* 283 F.3d 1098, 1102–03

(9th Cir.2002) (holding that, under *Cleveland*, a hunting license is not property for the purposes of the mail fraud statute); *United States v. Peter*, 310 F.3d 709 (11th Cir.2002) (granting a petitioner *coram nobis* relief because, after *Cleveland*, his misrepresentations in applying for alcoholic beverage licenses did not violate the mail fraud statute).

A few circuits have, however, considered the relevance of *Cleveland* to prosecutions based upon tax fraud. In a similar case involving a scheme to evade Canadian taxes on liquor through smuggling alcohol from Maryland to Canada via Niagara Falls, New York, the Fourth Circuit held that, "because a government has a property right in tax revenues when they accrue, the tax revenues owed Canada and the Province of Ontario by reason of the Defendants' conduct in the present case constitute property for purposes of the wire fraud statute." *United States v. Pasquantino*, 336 F.3d 321, 332 (4th Cir.2003) (*en banc*) (internal citation omitted). This Circuit previously reserved the question in interpreting RICO, noting that:

> In *Pierce*, the defendants were "not accused of scheming to defraud the Canadian Government of its property, but of its *right* to obtain property, its *right* to be paid money." The court assumed that such a right could constitute "property" for the purpose of RICO. These decisions predate *Cleveland v. United States*, in which the Supreme Court held that an unissued video poker license held by the state did not constitute "property" for the purposes of the mail fraud statute. Given that we decide this case based on the revenue rule, it is unnecessary for us to visit the issue of what constitutes "property" under RICO in light of *Cleveland*.

*R.J. Reynolds*, 268 F.3d at 124 n. 27 (internal citations omitted). Although we considered the issue in *Porcelli v. United States*, 303 F.3d 452 (2d Cir.2002), we did not evaluate whether *Cleveland* had altered the landscape. Instead, we addressed the question of whether a New York State Court of Appeals decision had rendered a habeas petitioner's mail fraud conviction invalid because it "establishe[d] that uncollected and unremitted sales taxes are not the property of the State." *Id.* at 453. We upheld the petitioner's conviction, citing *McNally*, but not *Cleveland*, on the grounds that the petitioner "used fraud to conceal from the State its claim for sales taxes and thus effectively deprived the State of its property right in its chose in action." *Id.* at 457.

Although one post-*Cleveland* case appears, at first glance, to undermine the identification of taxes as property under the mail and wire fraud statutes, analysis demonstrates that tax credits are quite different from run-of-the-mill sales and income taxes. In *United States v. Griffin*, 324 F.3d 330 (5th Cir.2003), the Fifth Circuit concluded that unissued federal income tax credits that serve as incentives for developers to build housing projects setting aside certain units for low-income residents are not property in the possession of the governmental agency. *Id.* at 354. The court reached this result, however, only after determining that "[u]nissued tax credits have zero intrinsic value," *id.*, and that "the benefit that the State of Texas receive[d] from [the fees it exacts after the tax credits have been issued] is minute compared to the benefit that is realized from the creation of affordable rental housing, which is the goal of the tax credit program," *id.* at 355. As with the licenses at issue in *Cleveland*, the purpose of the tax credits was purely regulatory, and the credits did not entitle the State to a positive income flow. Nor would one who received a tax credit by fraudulent means deprive the State of its revenues. Rather, "[t]he tax credits are not actually

issued on a project involving new construction ... until the rental units actually have been constructed and placed in service at reduced rent for low-income occupants." *Id.* An entity that—even improperly—obtained the right to such tax credits would have to fulfill its obligations to the State and would not accrue a tax advantage without incurring a reciprocal duty. *Griffin* is thus distinguishable from cases involving sales or income taxes.

Finally, at oral argument, Petitioner expressly disavowed reliance on an argument that others involved in the same conspiracy have made—that the government did not prove the existence, under federal law, of the statutory scheme according to which Canada enjoys the right to collect taxes. *See United States v. Pierce,* 224 F.3d 158, 165–66 (2d Cir.2000). Therefore, for purposes of this appeal only, we assume the existence of such a statutory scheme.

Because the decision in *Cleveland* did not affect courts' pre-existing consensus that taxes owed to a government—whether state, federal, or foreign—are property in the hands of that government, Fountain cannot meet his burden of demonstrating actual innocence.

### CONCLUSION

Because we interpret the Supreme Court's decision in *Cleveland* as effecting a limited alteration in the course of interpretation of the mail and wire fraud statutes rather than as completely redirecting the stream, we continue to deem taxes owed to governments—whether foreign or domestic and whether state or federal—"property" within the meaning of the mail and wire fraud statutes. Petitioner's claim of actual innocence must therefore fail. We likewise reaffirm our decision in *Trapilo* that the common law revenue rule does not bar prosecutions for defrauding foreign governments of taxes. In light of this precedent, Petitioner cannot demonstrate

ineffective assistance of counsel. Fountain's petition for habeas corpus is therefore denied.