# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

ALDO TARALLO,
            *Defendant-Appellant.*

No. 02-50252

D.C. No.
CR-00-00186-ABC

ORDER
AMENDING
OPINION AND
DENYING
PETITION FOR
REHEARING AND
PETITION FOR
REHEARING EN
BANC AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Audrey B. Collins, District Judge, Presiding

Argued and Submitted
June 9, 2004—Pasadena, California

Filed August 20, 2004
Amended June 29, 2005

Before: Dorothy W. Nelson, John R. Gibson,* and
Susan P. Graber, Circuit Judges.

Opinion by Judge Graber

*The Honorable John R. Gibson, Senior Circuit Judge for the United
States Court of Appeals for the Eighth Circuit, sitting by designation.

7683

**COUNSEL**

Barry Tarlow and Tarik S. Adlai, Tarlow & Berk, Los Angeles, California, for the defendant-appellant.

Steven J. Olson, Assistant United States Attorney, Major Frauds Section, Los Angeles, California, for the plaintiff-appellee.

---

## ORDER

The opinion filed August 20, 2004, is amended as follows:

On slip opinion page 11814, and published at 380 F.3d 1174, 1196 (9th Cir. 2004), delete footnote 9 and add the following sentence to the conclusion at the end of the opinion: "The remainder of the sentence is REMANDED to the district court for proceedings consistent with *United States v. Ameline*, No. 02-30326, 2005 WL 1291977 (9th Cir. June 1, 2005) (en banc)."

With this amendment, the panel has voted to deny the petition for rehearing. Judge Graber has voted to deny the petition for rehearing en banc, and Judges D.W. Nelson and Gibson have so recommended.

The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on it.

The petition for rehearing and petition for rehearing en banc are DENIED. No further petitions for rehearing or petitions for rehearing en banc may be filed.

---

## OPINION

GRABER, Circuit Judge:

Defendant Aldo Tarallo appeals his convictions on six counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5; and four counts of mail

fraud, in violation of 18 U.S.C. § 1341. We reverse his convictions with respect to three vicarious liability counts for lack of evidence. In affirming the remaining seven counts, we hold that a defendant may commit securities fraud "willfully" in violation of 15 U.S.C. § 78ff and 17 C.F.R. § 240.10b-5 even if the defendant did not know at the time of the acts that the conduct violated the law. We further hold that a defendant may commit securities fraud "willfully" by intentionally acting with reckless disregard for the truth of material misleading statements. Finally, we hold that 15 U.S.C. § 78ff is not facially unconstitutional as a violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant and two co-defendants, David Colvin and John Larson, together participated in a fraudulent telemarketing scheme. Colvin owned several companies used in the scheme, including Intellinet, Inc., and Larson was Intellinet's sales manager. Defendant was hired by Intellinet as a telemarketer, and he participated in the fraud from April 1997 until February 20, 1998. Defendant and others solicited those called to invest in various businesses whose value and operations were fictitious. These purported businesses included Medical Advantage, Inc. ("Medical Advantage"), Lamelli Medical Technology, Inc. ("Lamelli"), and R.A.C. International, Inc. ("R.A.C.").

Defendant and his co-defendants falsely represented to potential investors that Medical Advantage operated independent weight loss clinics around the country and had a projected 1997 revenue of $8.2 million, and that C. Everett Koop and Tom Brokaw supported or were affiliated with the company. Defendant and his co-defendants falsely represented to potential investors that Lamelli had developed a detoxification system that could detoxify a person of all alcohol or drugs in 15 minutes, that the system had won FDA approval, and that $187 million in revenue was expected to be generated

by this alleged invention in 1998. Defendant and his co-defendants falsely represented to potential investors that R.A.C. had generated $2.3 million in revenue in 1997 from sales of motor oil, car batteries, and tools, and that the company projected for 1998 revenues of approximately $3.5 million.

Defendant and his co-defendants told potential investors that they would be investing by means of promissory notes, which would be held in a "trust" for a fixed term of between 90 and 180 days. In return, the investors would receive 12 percent interest per annum and shares of "restricted stock" in the company. Defendant told investors that the company's Initial Public Offering ("IPO") would occur on or before the date on which the promissory note was to mature, at which point investors could (at their option) either receive back their invested principal or use it to purchase shares offered in the IPO. Instead of holding the invested funds in trust as promised, however, Colvin and others used those funds for the benefit of Colvin, Larson, Defendant, and their associates, and the investors never saw their money again.

After a nine-day trial, a jury convicted Defendant on six counts of securities fraud and four counts of mail fraud. The district court sentenced him to 37 months' imprisonment on each count, with the sentences to run concurrently. Defendant timely appealed.

## DISCUSSION

Defendant presents four arguments on appeal: (A) there was insufficient evidence to support the fraud convictions; (B) there was insufficient evidence to support the convictions on counts arising from acts committed by other telemarketers; (C) the district court erred in instructing the jury; and (D) the prosecution engaged in misconduct that prejudiced Defendant. We will address each of these arguments in turn, but agree with Defendant only as to the second argument.

A.  Evidence Supporting the Fraud Convictions

1.  *Standard of Review.*

We review de novo the question whether sufficient evidence was adduced at trial to support a conviction. *United States v. Diaz-Cardenas*, 351 F.3d 404, 407 (9th Cir. 2003). We view the evidence in the light most favorable to the government, and it is sufficient if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Plache*, 913 F.2d 1375, 1381 (9th Cir. 1990).

2.  *Defendant knowingly made false statements.*

**[1]** A defendant may be convicted of committing mail fraud in violation of 18 U.S.C. § 1341 only if the government proves beyond a reasonable doubt that the defendant had the specific intent to defraud. *United States v. Sayakhom*, 186 F.3d 928, 941 (9th Cir.), *amended by* 197 F.3d 959 (9th Cir. 1999). Likewise, a defendant may be convicted of committing securities fraud only if the government proves specific intent to defraud, mislead, or deceive. *United States v. Brown*, 578 F.2d 1280, 1284 (9th Cir. 1978).

Defendant argues that there was insufficient evidence that he knew that the statements he made to potential investors were false. If he did not even know that the statements were false, of course, he could not have had the specific intent to defraud. He points out that Colvin and Larson distributed typewritten scripts for salespeople to use during sales calls, and he asserts that the investment materials they provided to Defendant (and passed along to investors) were sophisticated and were not recognizably false. In essence, Defendant claims that no evidence at trial established that he was anything other than an innocent who was duped right along with the investors.

The record does not support Defendant's claim. A reasonable factfinder could have found beyond a reasonable doubt that Defendant knew of the fraudulent nature of the scheme in which he was participating.

[2] For example, the jury was presented with evidence that Defendant knew that it was a lie to assure investors that their money was guaranteed and risk-free because it was held in a "trust" until the IPO occurred. For example, Crew testified that Defendant told him that his investment would be held in a trust and that, after the IPO, he could receive his principal back with interest, or else receive shares in the company. However, Defendant received paychecks from Sierra Ridge Management Trust, which was one of the trusts for which Defendant solicited investors. Agent Goldman testified that, after being arrested and Mirandized, Defendant admitted that he knew he was being paid out of the same "trust" companies that investors' money was being deposited. Paul Coynes, who worked with Defendant as a telemarketer, also testified for the prosecution. Coynes explained that he realized after a time that it was impossible for the money he was soliciting to be held safely in a trust:

> [W]e told people that all the money went into the trust company. And at some point it became clear to me how ridiculous that was because we were getting paid a commission, the sales manager was getting paid a commission, and the owner of the company was obviously living a decent life-style and that money had to come from somewhere.

A juror could reasonably conclude from this evidence that Defendant knew that the "trusts" were not actually safe, but were being raided for payroll.

The jury also heard evidence that Defendant lied to potential investors about where he was located, telling them during telephone conversations that he was in a different office from

Colvin, an office that did not exist. Investor-victim John Wiedmer testified that Defendant told him that he was in a Washington, D.C., office, while Colvin was in California. Wiedmer testified that this statement influenced his decision to invest because it made the publishing company Defendant was pitching sound like "a pretty big operation," and that representation added some credence to the legitimacy of the enterprise. Likewise, investor-victim Keith Crew testified that Defendant sometimes claimed to be in Washington, D.C., when they spoke on the telephone and that Defendant provided him with a business card from Al Tarall (Defendant's alias) in Washington, D.C. However, Agent Steven Goldman of the FBI testified that, in the course of his investigation into the telemarketing scheme, he learned that the "Washington office" was only a "virtual office" that consisted simply of a service that answered the telephones and forwarded mail.

**[3]** The foregoing evidence supported the jury's finding beyond a reasonable doubt that Defendant knew of the fraudulent nature of the telemarketing scheme and that he acted with the intent to defraud.

   3.   *The false statements were material.*

**[4]** A misrepresentation must be material to form the basis of a conviction for mail or securities fraud. *Neder v. United States*, 527 U.S. 1, 25 (1999) (mail fraud); *United States v. Smith*, 155 F.3d 1051, 1064 (9th Cir. 1998) (securities fraud under 17 C.F.R. § 240.10b-5). For mail fraud, the test is whether the statement has a natural tendency to influence, or is capable of influencing, the addressee's decision. *United States v. LeVeque*, 283 F.3d 1098, 1103-04 (9th Cir. 2002). For securities fraud, a statement is material if there is a substantial likelihood that a reasonable investor would consider it important in making a decision. *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 934 (9th Cir.), *cert. denied*, 124 S. Ct. 433 (2003).

Defendant's false statement that the invested funds would be placed in a trust and would be safe there was material under both the mail fraud and securities fraud standards. Such a statement has a natural tendency to influence a potential investor's decision to invest, and a reasonable investor would find the level of risk to be important in deciding whether to invest.

The materiality of Defendant's false statements that he was in an office in Washington, D.C., is a closer question, but we conclude that these statements also were material. By making the business appear to be a "pretty big operation," these statements had a natural tendency to influence a potential investor's decision. Similarly, a potential investor might consider multiple office locations, and travel to them, to be indices of sophistication, prosperity, or business savvy, which would be important in making a decision whether to invest.

Defendant cites *LeVeque*, 283 F.3d at 1104, in support of his argument that his lies regarding his location were not material. In *LeVeque*, we distinguished the Second Circuit's decision in *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1178 (2d Cir. 1970). We explained that a fraud conviction could be maintained in *LeVeque* because the "defendants materially misrepresented the advantages of their offer." 283 F.3d at 1104. This had not been true in *Regent*, where the false statements were made only in order to gain access to make their sales pitch, and did not misrepresent "the price or quality of the product being sold." *LeVeque*, 283 F.3d at 1104. The Second Circuit therefore determined in *Regent* that the statements were not material. *Id.* Defendant relies on *LeVeque* to argue that *only* direct misrepresentations of the price, quality, or advantages of the transaction are material. We disagree. The standards we cite above clearly allow for a broader class of conduct to be considered material. Here, Defendant's misrepresentations were designed to give a false impression as to the size and nature of his own company as well as the businesses in which victims were being asked to

invest. *LeVeque* was merely distinguishing the facts of that case with a case in which the only misrepresentations were related to gaining access to customers in order to pitch an otherwise honest product.

**[5]** In short, Defendant's misrepresentations were material, and there was sufficient evidence of them presented to the jury. We therefore affirm the jury's convictions on the "direct liability" counts.

## B.   The "Vicarious Liability" Convictions

Defendant was convicted on counts 7, 23, and 24 of the indictment, all of which charged him with mail fraud and securities fraud arising out of sales made by other employees of the telemarketing firm. The district court instructed the jury on two theories for these counts: an aiding-and-abetting theory, and a causing-another-to-commit-a-crime theory. The court did *not* instruct the jury on a "coschemer liability" theory.

With respect to aiding and abetting, the court instructed that whoever "aids, abets, counsels, commands, induces or procures the commission of a crime against the United States is as guilty as a principal." The court explained that, to prove a defendant guilty under 18 U.S.C. § 2(a), the government must prove beyond a reasonable doubt: (1) that a crime was committed by someone; (2) that the defendant knowingly and intentionally aided, counseled, commanded, induced, or procured that person to commit the crime; and (3) that the defendant acted before completion of the crime. The defendant must have acted with the knowledge and intention of helping the actor commit the crime.

The court also provided an instruction for causing another to commit a crime under 18 U.S.C. § 2(b). This instruction explained that whoever "willfully causes an act to be done

which if directly performed by him . . . would be an offense against the United States is guilty as a principal."

Defendant argues that insufficient evidence was adduced to prove beyond a reasonable doubt that the telemarketers who were involved in the charged transactions committed any crimes, or to prove that Defendant either aided or abetted any crimes or caused the other telemarketers to commit any crimes. The government responds primarily that sufficient evidence existed for the jury to convict Defendant on the vicarious liability charges under a "coschemer liability" theory.

**[6]** Under "coschemer liability," a defendant who commits mail fraud is vicariously liable for all the acts of his coschemers in furtherance of the scheme, if the acts were reasonably foreseeable to the defendant. *United States v. Stapleton*, 293 F.3d 1111, 1116-17 (9th Cir. 2002). The government concedes that it did not request, and that the district court did not give, a jury instruction on coschemer liability. Nevertheless, the government argues, the jury was entitled to convict Defendant on the vicarious liability counts under a coschemer theory because it *was* instructed that the government can prove that a defendant is guilty of securities fraud if the evidence proved that he took part in a "scheme . . . to defraud" or "engaged in a course of business which operated as a deceit," and that the jury could convict Defendant for mail fraud if the government proved that he "knowingly participated in a scheme or plan to defraud."

The government correctly notes that the victim investors in the transactions at issue in counts 7, 23, and 24 testified to experiencing the same type of fraud as did the witnesses with whom Defendant had dealt directly. Therefore, the government posits, there was sufficient evidence before the jury that these transactions were criminal and that Defendant reasonably could have foreseen the solicitation of these victims.

**[7]** The problem with this argument is that, in order to convict Defendant under a "coschemer" theory, the jury would have had to find beyond a reasonable doubt that Defendant's fellow telemarketers were, in fact, coschemers acting in furtherance of the scheme. *See Stapleton*, 293 F.3d at 1118 (explaining that jury instructions were adequate because they "required the jury to find that the co-schemers' acts were in furtherance of the unlawful scheme"). However, the jury was never instructed on coschemer liability, and so it was not informed that this fact was a necessary predicate to a conviction. Neither of the vicarious liability theories on which the jury was instructed required it to find beyond a reasonable doubt that Defendant's fellow telemarketers were coschemers. Because the jury was not instructed that it had to find beyond a reasonable doubt all elements of coschemer vicarious liability, on appeal the government may not rely on this new theory. *See McCormick v. United States*, 500 U.S. 257, 270 n.8 (1991) ("[T]he Court of Appeals affirmed [defendant's] conviction on legal and factual theories never tried before the jury . . . . [F]or that reason alone . . . the judgment must be reversed.").

The government argues, in the alternative, that there was sufficient evidence to convict Defendant on the aiding and abetting theory, because he aided the transactions at issue by taking a 20 percent commission on his sales, while the balance of the "invested" money was available (and in part used) for paying expenses of the telemarketing operations. The government reasons that, merely by bringing money into the shop, Defendant aided the actions of his fellow telemarketers.

**[8]** We disagree. There was no evidence that Defendant, when generating revenues, intentionally aided any of his co-workers in committing their own frauds, as distinct from making money for himself. Nor did the government present evidence that the money brought in by Defendant was used specifically to support the frauds charged in counts 7, 23, and 24. In the circumstances, there was insufficient evidence for

the jury to convict Defendant on these counts based on an aiding and abetting theory.

The government no longer argues that the convictions can be sustained under 18 U.S.C. § 2(b).

**[9]** Because there was insufficient evidence to support the jury's convictions for vicarious liability under the theories on which the district court instructed the jury, we reverse Defendant's convictions on counts 7, 23, and 24.

C. Jury Instructions

Defendant claims several errors in the jury instructions relating to the fraud counts as to which there was sufficient evidence.

1. *Standards of Review.*

We review de novo the question whether a trial court's jury instruction accurately states the law. *United States v. Hopper*, 177 F.3d 824, 831 (9th Cir. 1999). By contrast, we review for abuse of discretion a district court's formulation of jury instructions. *United States v. Franklin*, 321 F.3d 1231, 1240-41 (9th Cir.), *cert. denied*, 124 S. Ct. 161 (2003). Finally, we review for plain error challenges to jury instructions that were not objected to before the district court. *United States v. Delgado*, 357 F.3d 1061, 1065 (9th Cir. 2004).

2. *Instructions equating "willfully" and "knowingly."*

Defendant was charged with, and convicted of, securities fraud under 15 U.S.C. § 78ff and under 17 C.F.R. § 240.10b-5, which was promulgated under the authority of 15 U.S.C. § 78j. Section 78ff(a) states:

(a) Willful violations; false and misleading statements

Any person who *willfully* violates any provision of this chapter (other than section 78dd-1 of this title), or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this chapter, or any person who *willfully and knowingly* makes, or causes to be made, any statement in any application, report, or document required to be filed under this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of section 78o of this title, or by any self-regulatory organization in connection with an application for membership or participation therein or to become associated with a member thereof, which statement was false or misleading with respect to any material fact, shall upon conviction be fined not more than $5,000,000, or imprisoned not more than 20 years, or both, except that when such person is a person other than a natural person, a fine not exceeding $25,000,000 may be imposed; but no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation.

15 U.S.C. § 78ff(a) (2003) (emphases added).

The district court instructed the jury on "knowingly" and "willfully" as follows:

Each of the crimes charged in the indictment requires proof beyond a reasonable doubt that the defendant acted knowingly. An act is done knowingly if the defendant is aware of the act and does not act or fail to act through ignorance, mistake, or accident.

The government is not required to prove that the defendant knew that his acts or omissions were

unlawful. Thus, for example, to prove a defendant guilty of securities fraud or mail fraud based on making a false or misleading representation, the government must prove beyond a reasonable doubt that the defendant knew the representation was false or was made with reckless indifference to its truth or falsity, but it need not prove that in making the representation the defendant knew he was committing securities fraud, mail fraud, or any other criminal offense.

In these statutes, willfully has the same meaning as knowingly.

Defendant argues that the court erred by instructing that "willfully" and "knowingly" mean the same thing, and by instructing that the government did not have to prove that defendant knew that his conduct was unlawful. He argues that the "willful" instruction runs afoul of *Bryan v. United States*, 524 U.S. 184, 191-92 (1998), in which the Supreme Court stated:

As a general matter, when used in the criminal context, a "willful" act is one undertaken with a "bad purpose." In other words, in order to establish a "willful" violation of a statute, "the Government must prove that the defendant acted with knowledge that his conduct was unlawful." *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994).

(Footnote omitted.) Because 15 U.S.C. § 78ff requires a showing of "willfulness," Defendant argues, it was error to instruct the jury that Defendant could be convicted even if the jury found that he did not know that his conduct was unlawful.

**[10]** As an initial matter, we note that the district court *did* err in this instruction, although not in the way that Defendant

claims.[1] As quoted above, the district court instructed that "[e]ach of the crimes charged in the indictment requires proof beyond a reasonable doubt that the defendant acted *knowingly*." (Emphasis added.) However, § 78ff(a) states that a person who "willfully" violates any provision of the chapter or any rule or regulation promulgated thereunder is subject to criminal penalty. 15 U.S.C. § 78ff. "Knowingly" is not a required element. *Id.* "Knowingly" *is* an element for the conviction of any individual who "makes, or causes to be made, any statement in any application, report, or document required to be filed under this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of section 78o of this title." *Id.* As § 78ff makes clear, such a person must be found to have engaged in the proscribed conduct "willfully and knowingly."

**[11]** The conduct for which Defendant was indicted, tried, and convicted did not involve the filing of an application, report, or document required by the securities laws. Instead, his conduct was covered by 17 C.F.R. § 240.10b-5.[2] That conduct clearly falls under the first provision of § 78ff, which requires only that the act be done "willfully," but does *not* require that the act be done "knowingly." Therefore, the dis-

---

[1]Although Defendant did not point to the error we are about to discuss, we mention it to put into context our discussion of the claim he does raise.

[2]Rule 10b-5 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

trict court's instruction that "[e]ach of the crimes charged in the indictment requires proof beyond a reasonable doubt that the defendant acted knowingly" was erroneous.

However, the district court then went on to equate "willfully" with "knowingly." The district court's error in including "knowingly" in the instructions is therefore harmless so long as the definition the court provided for knowingly *and* willfully satisfies the statutory definition of "willfully." We turn now to that question.

The Supreme Court has taken pains to observe that the word "willful" "is a word of many meanings" and that "its construction is often influenced by its context." *Ratzlaf*, 510 U.S. at 141 (alterations omitted) (internal quotation marks omitted); *see also Bryan*, 524 U.S. at 191 (internal quotation marks omitted). We must consider, then, the context in which "willfully" is found in the securities fraud statutes. The question is whether the securities fraud statutes' use of the term "willfully" means that a defendant can be convicted of securities fraud only if he or she *knows that the charged conduct is unlawful*, or whether "willfully" simply means what the district court instructed it means: "knowingly" in the sense that the defendant *intends those actions* and that they are not the product of accident or mistake.

Defendant's argument—that willfullness requires that he knew that he was breaking the law at the time he made his false statements—has been previously rejected by this and other courts. In *United States v. Charnay*, 537 F.2d 341, 351-52 (9th Cir. 1976), we cited with approval the Second Circuit's interpretation of § 78ff in *United States v. Pelz*, 433 F.2d 48, 54 (2d Cir. 1970). The Second Circuit explained there that "[t]he language makes one point entirely clear. A person can willfully violate an SEC rule even if he does not know of its existence. This conclusion follows from the difference between the standard for violation of the statute or a rule or regulation, to wit, 'willfully,' and that for false or mis-

leading statements, namely 'willfully and knowingly.' " *Id.* at 54. We quoted a law review article cited in *Pelz*, 433 F.2d at 55, which "concluded it was necessary only that the prosecution establishes a realization on the defendant's part that he was doing a wrongful act." *Charnay*, 537 F.2d at 352 (quoting William B. Herlands, *Criminal Law Aspects of the Securities Exchange Act of 1934*, 21 Va. L. Rev. 139, 149 (1934)) (internal quotation marks omitted). Adopting the reasoning of the Second Circuit, we "accept[ed] this with the qualifications, doubtless intended by the author, that the act be wrongful under the securities laws and that the knowingly wrongful act involve a significant risk of effecting the violation that has occurred." *Id.* (internal quotation marks omitted).[3]

We also addressed an argument very similar to Defendant's in *United States v. English*, 92 F.3d 909 (9th Cir. 1996). In *English*, the defendant was convicted of securities fraud under 15 U.S.C. §§ 77q(a) and 77x. "Section 77q(a) makes it illegal to use instruments of interstate commerce to defraud or deceive purchasers of securities. Section 77x, a general penalty provision covering § 77q(a) and other 15 U.S.C. § 77 offenses, provides that '[a]ny person who *willfully* violates' § 77q(a) is subject to fines and incarceration. 15 U.S.C. § 77x (emphasis added)." *Id.* at 914. Section 77x is therefore substantively similar to the willfullness provision of § 78ff(a). In *English*, we rejected the defendant's argument that § 77x's willfullness requirement required that the government prove that the defendant knew that his conduct was illegal. We distinguished *Ratzlaf* and explained that "our cases . . . support the conclusion that §§ 77q(a) and . . . 77x do not require proof of knowledge of illegality." *Id.* at 915.

---

[3]The Eighth Circuit has expressed its agreement with *Charnay*, explaining that "[c]ourts that have interpreted 'willfully' in § [78ff] have reached the same conclusion that we reach in this case: 'willfully' simply requires the intentional doing of the wrongful acts—no knowledge of the rule or regulation is required. *United States v. O'Hagan*, 139 F.3d 641, 647 (8th Cir. 1998) (citing *Charnay*).

Even were we not bound by our existing precedent, we would reach the same result. The final clause of § 78ff(a) provides that "no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation." 15 U.S.C. § 78ff(a). The opening sentence of subsection (a) explains that "[a]ny person who *willfully* violates any provision of this chapter . . . or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this chapter" commits a crime. *Id.* (emphasis added). If "willfully" meant "with knowledge that one's conduct violates a rule or regulation," the last clause proscribing imprisonment—but not a fine—in cases where a defendant did *not* know of the rule or regulation would be nonsensical: If willfully meant "with knowledge that one is breaking the law," there would be no need to proscribe imprisonment (but permit imposition of a fine) for someone who acted *without* knowing that he or she was violating a rule or regulation. Such a person could not have been convicted in the first place.

**[12]** Under our jurisprudence, then, "willfully" as it is used in § 78ff(a) means intentionally undertaking an act that one knows to be wrongful; "willfully" in this context does *not* require that the actor know specifically that the conduct was unlawful. The district court's instructions correctly informed the jury that it had to find that defendant intentionally undertook such an act:

> [T]o prove a defendant guilty of securities fraud or mail fraud based on making a false or misleading representation, the government must prove beyond a reasonable doubt that the defendant knew the representation was false or was made with reckless indifference to its truth or falsity, but it need not prove that in making the representation the defendant knew he was committing securities fraud, mail fraud, or any other criminal offense.

**[13]** The district court's instructions thus required the jury to find that Defendant had made statements that he knew at the time were false, or else made them with a reckless disregard for whether they were false.[4] The district court therefore required the jury to find that Defendant undertook acts that he knew at the time to be wrongful, meeting the standard for defining "willfully" in this circuit. The district court's importation of the term "knowingly" into the jury instructions was harmless beyond a reasonable doubt, because the court equated "knowingly" with "willfully," and the court's definition properly explained "willfully."

3. *Recklessness standard for securities fraud.*

As discussed above, the district court instructed the jury that it could convict Defendant of both mail fraud and securities fraud if it found that he had made a false statement, which was a representation that either "(a) was then known to be untrue by the person making or causing it to be made or (b) was made or caused to be made with reckless indifference as to its truth or falsity." Defendant argues that the recklessness portion of the instruction was error as to the securities fraud counts.

The comment to Ninth Circuit Model Jury Instruction 9.7 (2000) states that reckless disregard for truth or falsity is sufficient to sustain a conviction for securities fraud. The comment cites *United States v. Farris*, 614 F.2d 634, 638 (9th Cir. 1979), for this proposition. Defendant argues that the comment incorrectly describes the law to be applied in this case, because *Farris* was not a 15 U.S.C. §§ 78j(b) or a 78ff prosecution, because *Farris* relied on a civil securities fraud case, and because the Supreme Court's decision in *United States v. O'Hagan*, 521 U.S. 642 (1997), stands for the proposition that recklessness is insufficient to sustain a *criminal* conviction for securities fraud. In *O'Hagan*, the Supreme Court said that, in

---

[4]We discuss the recklessness instruction in the next section.

order to convict a defendant of securities fraud, the government must prove that the defendant "willfully" violated Rule 10b-5. 521 U.S. at 665-66 (citing 15 U.S.C. § 78ff(a)).[5] Defendant again cites *Bryan*, 524 U.S. at 191-93, for the proposition that willfullness requires actual knowledge and argues that recklessness cannot satisfy this requirement.

**[14]** Defendant's argument fails. *Farris* explicitly holds that recklessness is adequate to support a conviction for securities fraud. Defendant's attempt to distinguish *Farris* on the ground that *Farris* involved a fraud charge under 15 U.S.C. § 77q(a), and not under § 78j(b), is unpersuasive. As we explained above, "willfully" in the context of § 78ff is best understood to mean "voluntarily and knowingly wrongful," not "with the intent to violate the law." Therefore, its absence in § 77q(a) does not render *Farris* distinguishable. We find no error in the recklessness instruction.

4. *Intent to harm.*

Defendant asked the district court to instruct the jury that, in order to convict Defendant of fraud, it had to find not only that he intended to *deceive* investors, but also that he intended

---

[5]On remand from the Supreme Court, the Eighth Circuit in *O'Hagan*, 139 F.3d at 647, interpreted the Supreme Court's *O'Hagan* opinion as "simply explaining that the statute provides that a negligent or reckless violation of the securities law cannot result in criminal liability; instead, the defendant must act willfully." That statement might be read as contrary to our holding here. In context, however, the Eighth Circuit's statement is consistent with our holding that the "willful" requirement of § 78ff does not preclude a conviction arising out of recklessness. The Eighth Circuit held, as we do, that § 78ff "simply requires the intentional doing of the wrongful acts—no knowledge of the rule or regulation is required." *Id.* Given that definition of "willful," the Eighth Circuit's formulation appears to be consistent with the view that a defendant could "willfully" violate § 78ff by willfully acting with reckless indifference to the truth of statements made in the course of the fraud. We therefore do not believe that our continued adherence to *Farris* creates a circuit split on this question.

to *harm* investors. The district court declined to give Defendant's requested instruction.

Defendant cites *McNally v. United States*, 483 U.S. 350, 358 (1987), for the proposition that " 'to defraud' " means " 'to wrong[ ] one in his property rights by dishonest methods or schemes.' " *Id.* (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924)). Defendant reasons that the instruction was defective because it failed to convey that meaning.

**[15]** Even assuming that *McNally*'s definition of "defraud" is the only proper one, Defendant's argument is unavailing. He was charged with knowingly taking the investor-victims' money through deceit. The court instructed that "to defraud" means "to deceive." In this context, the jury necessarily understood the instruction to mean that it had to find that Defendant deceived investors by taking their money under false pretenses. An additional "intent to harm" instruction would have been redundant because intending to take someone's money *is* an intent to harm. The district court's decision not to give Defendant's requested instruction was therefore not an abuse of discretion.

### 5. *Materiality element of mail fraud.*

The district court instructed the jury on the materiality element of mail fraud as follows: "[Statements are material if] they would reasonably influence a person to part with money or property." Citing *Neder*, Defendant argues that this instruction was insufficient because a materiality instruction in a fraud case must make clear that the statement at issue was "important" to the decision-making process of the victim. *Neder* quoted the Restatement (Second) of Torts § 538 (1977) for the proposition that a matter is material if:

> "(a) a reasonable man would attach *importance* to its existence or nonexistence in determining his choice of action in the transaction in question; or

"(b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as *important* in determining his choice of action, although a reasonable man would not so regard it."

527 U.S. at 22 n.5 (emphasis added). Defendant argues that *Neder* requires that a jury be instructed in a fraud case that, for a statement to be material, it must be "important" to a reasonable person.

Defendant's argument is contrary to our holding in *United States v. Johnson*, 297 F.3d 845, 866 (9th Cir. 2002), that the Supreme Court in *Neder* did not intend to supplant the previously existing definition of materiality provided by the Court in *United States v. Gaudin*, 515 U.S. 506, 509 (1995). The *Gaudin* Court reaffirmed its definition of materiality as a requirement that the statement have "a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Id.* (alteration in original) (internal quotation marks omitted). In *Johnson*, we held that *Gaudin*'s definition survived *Neder*:

> At no point in the relevant passage from *Neder* did the Court indicate that it was abandoning *Gaudin* or adopting the Restatement's view as the exclusive definition of materiality. Indeed, in an earlier passage in *Neder*, the Court favorably cited *Gaudin* as providing the general definition of materiality. *See Neder,* 527 U.S. at 16. Therefore, at most, *Neder* stands for the proposition that alternative meanings of materiality are permissible. Because *Gaudin* is one such permissible alternative, and because Instruction 8.26.1 is substantially similar to it, the instruction in this case was not plainly erroneous.

*Johnson*, 297 F.3d at 866 n.21. Although in *Johnson* we reviewed for plain error, we unequivocally held that *Gaudin*

is a permissible instruction for "materiality," even after *Neder*, and only *then* held that the instruction was not plainly erroneous.

**[16]** The district court's instruction, which followed *Gaudin* and *Johnson*, was not an abuse of discretion.

6.  *Absence of a "puffing" instruction.*

Defendant proposed two "puffing" instructions. The district court rejected both. The district court did give a good-faith instruction, telling the jury:

> The good faith of Defendant [ ] is a complete defense to the charges of the indictment because good faith on the part of the defendant, is, simply, inconsistent with the intent to defraud alleged in that charge. Actually, that should be "in those charges."

> A person who acts, or causes another person to act, on a belief or an opinion honestly held is not punishable under this statute merely because the belief or opinion turns out to be inaccurate, incorrect, or wrong.

> And again, that should be is not punishable under these statutes. This does apply to all of the charges.

> An honest mistake in judgment or an error in management does not rise to the level of intent to defraud.

> A defendant does not act in "good faith" if, even though he honestly holds a certain opinion or belief, that defendant also knowingly makes material false or fraudulent pretenses, representations, or promises to others.

> While the term "good faith" has no precise definition, it means, among other things, a belief or opinion honestly held, an absence of malice or ill will, and an intention to avoid taking unfair advantage of another.

> The burden of proving good faith does not rest with the defendant because the defendant does not have any obligation to prove anything in this case.

> In determining whether or not the government has proven beyond a reasonable doubt that the defendant acted with an intent to obtain money or property by means of false or fraudulent pretenses, representations, or promises, or whether the defendant acted in good faith, the jury must consider all of the evidence in the case bearing on the defendant's state of mind.

> A belief that a victim will be repaid and will sustain no loss, even if that belief is held in good faith, is not a defense to a charge of securities or mail fraud.

> It is also not a defense to charges of securities fraud and mail fraud that the victim may have been gullible or negligent. The laws against fraud are designed to protect the naive and careless as well as the experienced and careful.

> While good faith is a defense to securities fraud and mail fraud, an honest belief in the ultimate success of the enterprise is not, in itself, a defense.

Defendant argues that a separate "puffing" instruction was necessary, because he could have made "misrepresentations" that fell outside the definition of good faith but qualified as puffery rather than fraud.

We held in *United States v. Amlani*, 111 F.3d 705, 718 (9th Cir. 1997), that a very similar good faith instruction in a fraud case adequately instructed the jury about the gist of a "puffing" defense. We based our holding on *United States v. Gay*, 967 F.2d 322, 329 (9th Cir. 1992), in which we explained that " '[p]uffing' concerns expressions of opinion, as opposed to the knowingly false statements of fact which the law proscribes." Thus, no "puffing" instruction is required if the district court gives an instruction that good faith constitutes a complete defense, that one who acts with honest intention does not possess fraudulent intent, that one who expresses an opinion honestly held by him is not chargeable with fraudulent intent even though such opinion is erroneous and such belief is a mistaken belief, and that evidence establishing only that a person made a mistake of judgment or an error in management, or was careless, does not establish fraudulent intent. *Id.* Such a good faith instruction "adequately convey[s] the defendant's message. 'Puffing,' enthusiasm, and even overzealous selling all fall under the umbrella of the good faith and honest intention instructions." *Id.*

**[17]** The same is true here. The district court's refusal to give Defendant's proposed "puffing" instruction was not erroneous.

### D.   Constitutionality of 15 U.S.C. § 78ff

#### 1.   *Standard of Review.*

We review de novo the question whether a statute is facially unconstitutional. *Lind v. Grimmer*, 30 F.3d 1115, 1121 (9th Cir. 1994).

#### 2.   *Knowledge of the rule or regulation.*

Defendant argues that § 78ff(a)'s final clause renders the statute facially unconstitutional, because it violates the rule announced in *Apprendi*, that any fact other than a prior con-

viction which increases the penalty for a defendant's crime beyond the statutory maximum must be submitted to the finder of fact and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490. The final clause of subsection (a) states that "no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation." 15 U.S.C. § 78ff(a).

**[18]** This part of the statute does not run afoul of *Apprendi* because it establishes a partial affirmative defense, not an element of the crime. Under the rest of subsection (a), the factfinder must find beyond a reasonable doubt that the defendant willfully (or for some offenses, willfully and knowingly) violated the dictates of 15 U.S.C. §§ 78(a)-78(lll) or any rule or regulation promulgated thereunder. *Id.* Once a factfinder has found *those* elements, the defendant stands convicted of the crime and a verdict of guilt is complete. But if the defendant who is convicted of violating a rule or regulation can prove that he or she did not know that such rule or regulation existed, the defendant may be fined but not imprisoned. This partial affirmative defense can *mitigate* a defendant's sentence, but is not an additional element that can *increase* the sentence. All elements that would result in incarceration (that defendant willfully, or willfully and knowingly, violated the securities statutes or rules or regulations) must be found by the factfinder beyond a reasonable doubt. *Apprendi* is therefore inapplicable.**⁶** *See United States v. Brown*, 276 F.3d 930,

---

**⁶**For the same reason, the Supreme Court's recent decision in *Blakely v. Washington*, 124 S. Ct. 2531 (2004), does not render § 78ff(a) unconstitutional. *Blakely*'s holding is premised on the *Apprendi* requirement that any fact that *increases* the penalty for a crime beyond the prescribed statutory maximum must be either admitted by the defendant or submitted to a factfinder and proved beyond a reasonable doubt. *Id.* at 2536. As discussed above, § 78ff(a) does not run afoul of this principle: the factfinder must find beyond a reasonable doubt that the defendant willfully (or, for some offenses, willfully and knowingly) violated the dictates of 15 U.S.C. §§ 78(a)-78(lll) or any rule or regulation promulgated thereunder. The lack-of-knowledge defense only *decreases* the penalty for that crime.

932 (7th Cir. 2002) ("*Apprendi* leaves undisturbed the principle that while the prosecution must indeed prove all the elements of the offense charged beyond a reasonable doubt, [*Apprendi*,] 530 U.S. at 477, the legislation creating the offense can place the burden of proving affirmative defenses on the defendant." (citation omitted)).

E.   Prosecutorial Misconduct

   1.   *Standard of Review*.

We review for abuse of discretion claims of prosecutorial misconduct. *United States v. Steele*, 298 F.3d 906, 910 (9th Cir. 2002), and review for plain error a claim of prosecutorial misconduct not objected to before the district court. *United States v. Geston*, 299 F.3d 1130, 1134 (9th Cir. 2002).

   2.   *Ethnic bias*.

Defendant argues that the prosecutor engaged in misconduct when he mentioned at trial that Defendant's true name was not the anglicized Al Tarall he used with investors, but was the Italian Aldo Tarallo. Defendant argues that this "shameless display of xenophobia" was an exercise by the prosecution that "equated assimilation with fraud." Defendant urges us to hold that the prosecutor's references to the anglicizing of Defendant's name "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted).

**[19]** Defendant's argument on this point is creative but unavailing. The prosecutor permissibly pointed out that Defendant used an alias when he dealt with potential investors (as did one of the non-Italian co-defendants). The prosecutor made no reference to Defendant's ethnicity, but only to the use of an alias and to the possibility that it was used so that investor-victims would not be able to track Defendant down

after they learned that they had been duped. Defendant is not entitled to prevent the government from pointing out his use of an alias just because the alias happens to be an "anglicized" version of Defendant's actual name. There was no misconduct.

3. *Defendant's refusal to speak with law enforcement.*

Next, Defendant argues that the prosecutor violated his Fifth Amendment right to remain silent when he questioned Agent Goldman about a telephone call Goldman had made to Defendant in September 1999. Goldman testified that he had called Defendant and, "when he answered, I asked if it was Al, and he said yes. And I explained to him—I identified myself, and he hung up on me." The prosecutor asked whether that was the first time he had tried to question Defendant, and Goldman said that it was. After being asked by the prosecutor what happened next, Goldman testified that he had called Defendant back and identified himself; when Defendant said that he did not know who the caller really was, Goldman gave him telephone numbers that would allow Defendant to verify his identity as an FBI agent.

At this point, defense counsel objected on the grounds that he had received no discovery about this exchange on the phone and that it was irrelevant and prejudicial. The district court advised the prosecutor to "[g]o now to the arrest. This is a waste of time, if nothing else. And I can't think of any probative value. So it's not relevant. Go to the arrest right now." The prosecutor agreed to do so, and defense counsel requested a limiting instruction. The district court agreed to give the instruction, over the prosecutor's objection. The court gave the following instruction:

> All right. Ladies and gentlemen of the jury, I just want to remind you and instruct you that nobody has to speak to a law enforcement officer who calls on the phone, and—we're all perfectly free to say, "I

don't want to talk to you," or hang up, and you should not draw any inference of guilt toward Mr. Tarallo because of the fact that he elected to do that, as is his right. It's all of our rights.

**[20]** Notwithstanding the district court's instruction, Defendant argues that the prosecutor's question to Agent Goldman regarding Defendant's hanging up during the first call violates Defendant's Fifth Amendment right to remain silent. We see no prejudice to Defendant, even assuming that the prosecutor pursued an improper line of questioning. The district court granted counsel's objection on relevance grounds, told the prosecutor to move on immediately, and gave a limiting instruction to the jury. The court thus cured any prejudice from this passing reference.

4.  *Defendant's right to remain silent and to exercise his right to a trial.*

During rebuttal argument at the end of the trial, the prosecutor explained to the jury that, even though government witness Paul Coynes (who testified as an "insider" who had worked with Defendant) was a "sleazy telemarketer," the prosecutor had decided to call him as a witness in order to give the jury an "inside" view of how the telemarketing operation worked. The prosecutor said that the government had also called Coynes "to give you a view to see somebody who has accepted responsibility for what he did, who has admitted to you, 'Yes, I lied. I lied. I knew these were lies, and I continued to make them.' "

Defendant argues that, in making the latter comments, the prosecutor indirectly was referring to Defendant as one who had not "accepted responsibility" the way Coynes admirably had. A prosecutor's statement is improper "if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." *Lin-*

*coln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987). Defendant also argues that the prosecutor, by his comments, improperly invited the jury to view Defendant disfavorably for exercising his constitutional right to plead not guilty and have a trial. *See Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort. . . .").

**[21]** In our view, the prosecutor's comments did not call attention to the fact that Defendant did not take the stand. The comments came somewhat closer to implying that Defendant was somehow dishonorable for exercising his right to a jury trial. However, the comments are best understood as an attempt to rehabilitate Coynes in order to increase the credibility of Coynes' testimony, and we think it most likely that the jury understood the comments as bearing on Coynes' credibility. So construed, the comments were not improper.

Even if the comments were improper, reversal would be appropriate only "where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis for the conviction, and where there is evidence that could have supported acquittal." *Sunn*, 807 F.2d at 809 (internal quotation marks omitted). In this case, the comments were isolated and not repeated, and there was no inference of guilt from silence stressed to the jury. Furthermore, the district court's instructions to the jury reminded the jury that, in reaching its verdict, it was to consider only the evidence presented during the trial, and that the arguments of counsel, including closing arguments, "[are] intended to help you interpret the evidence, but [they] are not evidence."

5. *The Blinkoff deposition.*

Before trial, and pursuant to a stipulation signed by Defendant and his counsel, the parties took the deposition of investor-victim Brian Blinkoff via a video-phone connection.

Blinkoff was ill, and his medical condition prevented him from traveling to Los Angeles, where the trial was conducted. The stipulation stated that the deposition would be admissible at trial as substantive evidence and that the government had provided Defendant's counsel with discovery pursuant to Federal Rule of Criminal Procedure 15 and 18 U.S.C. § 3500 (the "Jencks Act").[7]

The deposition lasted about two-and-a-half hours. During cross-examination, in responding to a question, Blinkoff mentioned that he had contemporaneous notes of conversations with Defendant. Blinkoff testified that he had told prosecutors a month earlier that he had such notes, but at that time they did not ask for copies of the notes. Blinkoff had discussed the existence of the notes again with prosecutors the day before his deposition, when (according to Blinkoff) the prosecutor told him that he should make copies and forward them to the government.

In the middle of the cross-examination, at the request of defense counsel, the notes were faxed to the lawyers in Los Angeles. However, not all of the pages were faxed, and Blinkoff reported that there were more notes that had not been sent. At the close of the deposition, Defendant's lawyer stated his objections on the record: "[W]e are not agreeing that this deposition is necessarily over. We may ask that it be renewed or we may ask that his testimony be stricken." Despite that reservation of an option to continue the deposition at a later

---

[7]The Jencks Act states, in part: "In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a). After the witness testifies on direct examination, the defendant is entitled to such statements or reports as are relevant to the testimony. *Id.* § 3500(b). The stipulation in this case called for the government to provide such documents *before* the deposition.

date, the defense never sought to schedule a further deposition with Blinkoff.

The government presented the stipulation to the district court, along with a proposed order authorizing the deposition to be received as substantive evidence, the day after the deposition. When the government began to introduce the video-taped deposition at trial a few weeks later, defense counsel moved to have the videotape excluded on the ground that the government had failed to live up to its agreement to provide all Jencks Act material and *Brady*[8] material to Defendant before the deposition.

The district court held that there was no *Brady* violation (a holding that Defendant does not challenge on appeal). The district court held that there *was* a violation of the Jencks Act. The court cited *United States v. Riley*, 189 F.3d 802 (9th Cir. 1999), for the proposition that a district court has discretion to refuse to impose sanctions for a Jencks Act violation and that the court's decision should rest on a consideration of the culpability of the government for the unavailability of the material and the resulting injury to the defendant. The district court found that it was "clearly . . . the government's fault" that the material had not been turned over. With respect to the injury to Defendant, the district court observed that the notes were often illegible, but the "gist" of them could be made out in most cases. Some of the notes related directly to the case, while others were "extraneous." The district court stated that it was a "close call," but decided that Defendant had not shown sufficient injury to merit striking Blinkoff's testimony. In so ruling, the district court also noted that defense counsel had waited until trial to object, and had not taken advantage of the opportunity to reopen the deposition; this fact created

---

[8]"*Brady* material is any evidence material either to guilt or punishment which is favorable to the accused, irrespective of the good faith or bad faith of the prosecution." *United States v. Hanna*, 55 F.3d 1456, 1459 (9th Cir. 1995) (citing *Brady v. Maryland*, 373 U.S. 83 (1963)).

doubt as to how much prejudice Defendant had really suffered.

On appeal Defendant argues that, because his agreement in the stipulation to waive his right to challenge the introduction of the deposition testimony was conditioned on the government's turning over certain materials, and because the government failed to turn over those materials in time, the court should have set aside the stipulation for lack of consent. However, Defendant did not seek that relief from the district court. Rather, Defendant argued simply that the witness should be excluded because of *Brady* and Jencks Act violations. The district court found no *Brady* violation and exercised its discretion not to strike the deposition as a result of the Jencks Act violation. The district court did not consider, because Defendant did not raise, the argument that the stipulation should be tossed out and that the admissibility of the deposition should therefore depend on the requirement that the witness be unavailable. Fed. R. Crim. P. 15(e) (2001). Defendant has therefore waived this argument on appeal. *See United States v. Velasco-Medina*, 305 F.3d 839, 848 n.5 (9th Cir. 2002) ("To the extent [Defendant] rest[s] his argument on different grounds, he waived it by failing to raise it before the district court.").

On appeal, Defendant also argues for the first time that Blinkoff was not "unavailable" and that Defendant's waiver of his right to challenge introduction of the deposition under the Sixth Amendment was infirm because no judicial officer ever asked Defendant if he understood his rights and was waiving them. These arguments were not raised below and are therefore not properly before us. *United States v. Keesee*, 358 F.3d 1217, 1220 (9th Cir. 2004) ("A theory for suppression not advanced in district court cannot be raised for the first time on appeal.").

## CONCLUSION

We REVERSE for lack of evidence Defendant's convictions on the "vicarious liability" counts (counts 7, 23, and 24),

and AFFIRM Defendant's conviction on all other counts. The district court shall vacate the sentences pertaining to counts 7, 23, and 24. The remainder of the sentence is REMANDED to the district court for proceedings consistent with *United States v. Ameline*, No. 02-30326, 2005 WL 1291977 (9th Cir. June 1, 2005) (en banc).